FRANCES DUNN BROCKWAY, as Executrix, etc., of ALBERT L. BROCKWAY, Deceased, Claimant, *v.* THE STATE OF NEW YORK, Defendant.

(Claim No. 23808.)

Court of Claims, February 21, 1936.

*Bond, Schoeneck & King,* for the claimant.

*John J. Bennett, Jr., Attorney-General [Joseph I. Butler; Assistant Attorney-General,* of counsel], for the defendant.

ACKERSON, J.   In 1933 Albert L. Brockway had been for many years a licensed architect living in the city of Syracuse.

In April, 1933, Mr. Brockway was selected by the directors of a public corporation of this State known as the Industrial Exhibit Authority to prepare and submit plans to them for three new buildings to be located on the State fair grounds at Syracuse.

These buildings were to be known as the horticultural building, the farm machinery and implement building and the pure food building.

Mr. Brockway prepared the plans and specifications for such buildings to the satisfaction of the directors of such corporation in accordance with the terms of his employment. Soon after completing the same Mr. Brockway died on the 25th day of June, 1933. Neither Mr. Brockway nor his estate have ever been compensated for the services so rendered.

In consequence thereof this claim was filed against the State to recover the fees which it was stipulated that Mr. Brockway should receive for preparing the plans and specifications for the three buildings above mentioned.

The claim was filed in accordance with chapter 754 of the Laws of 1934, which became a law on May 21, 1934.

The Attorney-General does not deny the rendition of the services as set forth in the claim, but contends that the State is not liable therefor; that the corporation known as the " Industrial Exhibit Authority " alone is liable for such services, if any liability exists; and that chapter 754 of the Laws of 1934 is unconstitutional.

We cannot agree with the Attorney-General's contention. The State fair at Syracuse has long been maintained by the State, as a State institution, for the benefit of all the people of the State and supported by the funds received from the conduct of the fair itself supplemented by appropriations made by the State Legislature.

It appears that in 1933 the agents of the State who had charge of the property of the State fair grounds and also of the conduct and management of the State fair determined that it was highly desirable to add the group of three buildings to the State fair grounds above mentioned.

State funds were not available to carry out said project. Thereupon the Legislature of the State conceived the idea of creating a public corporation known as the " Industrial Exhibit Authority " and empowering it to apply to the Reconstruction Finance Corporation at Washington to loan the money to finance this worthy project.

The act creating this corporation is known as chapter 246 of the Laws of 1933 and became a law on April 19, 1933. Said act conveyed to the corporation thus created certain lands on the State fair grounds " sufficient for sites of three proposed exhibition buildings."

It further provided that the directors of such corporation should

" consist of not more than nine persons, who shall be the same persons at any time acting as the State Fair Advisory Board."

It further provided that such directors " shall name an architect, a manager and such other officers and employees as may be needed and fix their compensation; shall prepare plans for financing, constructing, equipping and operating additional exhibition buildings not to exceed three in number, besides the present horticultural building; and shall execute such plans, to the end that such buildings shall be erected and made available for exhibits encouraging agriculture, arts, manufactures and trade."

It then provided that this corporation so created should be " self-liquidating and even sustaining to the other operations now or hereafter carried on in connection with the State Fair " " so far as is consistent " with the ends for which it was created.

The act then empowered the directors to do various things which included the power " to borrow money from the Reconstruction Finance Corporation," also the power to " employ an architect or architects, and a manager or managers, and such clerical, drafting, engineering, legal, advertising, publicity or other professional assistance, services and labor as may be deemed necessary for accomplishing the purposes, of this act, fix their compensation and at pleasure discharge any of them."

It further provided that the real and personal property of the corporation " shall be exempt from all taxation " and finally it provided that the corporation should annually file a statement of its financial transactions with the Governor and the Comptroller " and shall at the same time pay into the State treasury any balance on hand over and above what will be needed to pay obligations and current expenses already accrued or which will accrue in advance of current receipts."

It will be seen, therefore, that the " Industrial Exhibit Authority " is and was a State project. It was created by the State for its own benefit. It was a part of a scheme to enhance the upbuilding and development of the State fair. Its directors were identical with the members of the State Fair Advisory Board. It was responsible to the State in every way and its surplus funds were payable to the State Comptroller. It is evident from the statute creating it that it was the intention of the Legislature that it should be self-supporting, as is stated in section 4 " so far as is consistent " with the ends for which it was created. That language indicates that the Legislature was then well aware that it would need some financial assistance in order to get on its feet and get started. The evidence discloses that it could not even make an application to the Reconstruction Finance Corporation for funds to erect the buildings in question without plans and specifications. The work which Mr.

Brockway did was a necessary prerequisite to the beginning of operations. It became necessary to employ attorneys and to pay the expenses of its officers. Such fees and expenses it appears were paid by the State without objection. The services of an architect were of first importance. His work enabled the corporation to place its request for money before the Reconstruction Finance Corporation. That application was made for and in behalf of the State of New York. The interests of it and its people were involved. Its Legislature had empowered the agents of the State to make such application and that was the main object of creating the Industrial Exhibit Authority.

It was not until long after Mr. Brockway had been engaged by said Authority as its architect, and had prepared the plans in question, and had been taken from this earthly scene by the hand of death, that it first occurred to the Legislature to declare that the State should not be in any way obligated to the creditors of this Authority which it did by chapter 304 of the Laws of 1934, which became a law on April 27, 1934, nearly a year after Mr. Brockway died. That act in our judgment has no bearing on the issues involved here except as an indication that prior to its passage the Legislature did recognize the liability of the State to the creditors of the said Industrial Exhibit Authority. It is not to be presumed that our law-making body would engage in the idle ceremony of legislating against an obligation that had no existence.

The minutes of the meetings of the Industrial Exhibit Authority disclose that Mr. Brockway was engaged as its architect on April 24, 1933, to prepare plans and specifications for the three buildings in question and that his fee was fixed at three and one-half per cent of the cost of the buildings with one and one-half per cent added for supervision, making five per cent in all. This action of the directors was ratified and approved at another meeting of their board on June 15, 1933.

It further appears that these plans were accepted by said Authority, were explained by Mr. Brockway to the Governor of the State, and afterwards submitted to the Reconstruction Finance Corporation at Washington by the said Authority as part of its application for the necessary funds to erect the buildings. Such application was never granted; the object for which the corporation was organized by the State Legislature was never achieved; Mr. Brockway's fees for his plans, the actual drafting cost of which exclusive of overhead was $5,011.69, have never been paid.

The State, as represented by its Attorney-General, disputes liability and contends that this work performed by Mr. Brockway for and in behalf of the State under the employment of the authorized agents of the State must go unrewarded. We do not think that the Legislature intended the State to be so ungenerous. We believe

that Mr. Brockway's employment under the provisions of chapter 246 of the Laws of 1933 created an obligation on his part to perform and an obligation on the part of the State to pay for his services. But however this may be, it seems to us that the question of liability has been settled by the Legislature in enacting chapter 754 of the Laws of 1934, which conferred jurisdiction upon this court to hear and determine this claim. By that act the State consented to have its liability for the services of Mr. Brockway determined, and provided that " If the court shall find the services were rendered by Albert L. Brockway, deceased, in the manner alleged in the claim therefor and that the State, in right or justice or in law or equity, should pay therefor, damages therefor shall constitute a valid and legal claim against the State and the State shall be deemed to have been liable therefor and the court shall determine the value of such services and make an award and render judgment for such sum as it shall find to be just and equitable."

The Attorney-General's contention that the enabling act is unconstitutional is negatived by the decision of the Court of Appeals in the cases of *Williamsburgh Savings Bank* v. *State* (243 N. Y. 231) and *Farrington* v. *State* (248 id. 112).

Also his contention that the enabling act in section 1 only refers to services rendered for the " State Fair Advisory Board " does not in our judgment deprive this court from making an award herein because Mr. Brockway's employment was by the State Fair Advisory Board acting as directors of the Industrial Exhibit Authority and because in section 2 of the act the State assumes liability for the work Mr. Brockway did as set forth in the claim provided the court finds that in right or justice or in law or equity the State should pay therefor.

Section 3 of the act, which provides that " Nothing in this act shall be construed as passing upon the merits of this claim and no award shall be made or judgment rendered against the State unless sustained by such legal evidence as would create a liability in a court of law or equity against an individual or corporation," was not intended to nullify the preceding sections, but must be construed as calling upon the court to make its determination in accordance with the legal principles involved in the legislative act by which the State recognizes an obligation and calls upon the court to determine the validity of its action.

Mr. Brockway rendered the services; the State has recognized at least a moral obligation to pay for the same, and the court finds that the facts as set forth in the claim and proven on the trial constitute not only a moral but also a legal obligation upon the State.

The only question remaining, therefore, is the value of the services performed.

As Mr. Brockway was not called upon to supervise the construction of these buildings, he was only entitled at the time of his death to three and one-half per cent of the cost of said buildings. As the buildings were not constructed, we must determine their cost from the estimates of persons competent to judge what it would cost to erect such buildings.

Bids were called for and received on both the horticultural and farm machinery and implement buildings.

| | |
|---|---:|
| The low bid on the horticultural building was | $203,338 00 |
| The low bid on the farm machinery and implement buildings was | 152,227 00 |

Those bids were made by competent builders, who made a careful study of the plans and specifications, and would have been accepted if the money had been received from the Reconstruction Finance Corporation. The amounts so bid would have been the cost of construction upon which Mr. Brockway's fees would have been computed and we, therefore, adopt them here for the same purpose.

No bids were submitted on the pure foods building, but on this trial estimates of the cost of construction of such building were testified to by three competent witnesses. Messrs. Bennett and King were architects and Mr. Taylor was a general contractor. All were men of long experience in estimating costs of construction.

Their estimates were as follows:

| | |
|---|---:|
| Mr. Bennett | $94,683 00 |
| Mr. King | 90,000 00 |
| Mr. Taylor | 97,271 00 |

The average of these three estimates is $93,984, which we accept as the cost of construction of the pure food building.

Mr. Brockway's fees of three and one-half per cent, therefore, should be figured on the following amounts:

| | |
|---|---:|
| Horticultural building | $203,338 00 |
| Farm machinery and implement building | 152,227 00 |
| Pure food building | 93,984 00 |
| Total | $449,549 00 |

Three and one-half per cent of $449,549 amounts to $15,734.22, the amount of Mr. Brockway's commissions for the plans of the said three buildings, for which this claimant is entitled to an award herein directing the clerk of this court to enter judgment in her favor and against the State of New York for that amount.

BARRETT, P. J., concurs.